UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA, <br><br> -against- <br><br> KWAME ANDERSON, <br><br><div align="right">Defendant.</div> |

13-CR-414-LTS

<u>MEMORANDUM ORDER</u>

On November 4, 2025, the Court held an evidentiary supervised release revocation hearing to resolve two alleged violations of supervised release, Specifications 10 and 11, charged in an October 29, 2025, amended violation report (the "Report")[1] prepared by the United States Probation Office ("Probation" or "Probation Office").  At the conclusion of the hearing, the Court reserved decision.  Having now reviewed thoroughly the hearing transcript and evidence and all of the parties' submissions and having had the opportunity to view the testimony and assess the witnesses' credibility, the Court finds that the Government has met its burden of proving the supervised release violation charged in Specification 10, but has not met its burden with respect to Specification 11.

### I.    BACKGROUND

On May 14, 2013, before Judge Sidney H. Stein, defendant Kwame Anderson ("Mr. Anderson" or "Defendant") pleaded guilty to brandishing a firearm in relation to a narcotics conspiracy in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (Docket entry no. 327.)  Mr. Anderson was a member of a gang that sold drugs in the Bronx, New York.  (Docket entry no.

---

[1]    All citations to the Report are to the Fourth Amended Violation of Supervised Release and Petition For the Issuance of a Warrant, prepared by the Probation Office and dated October 29, 2025.

733 at 1.)  On May 1, 2015, Mr. Anderson was sentenced principally to 84 months of imprisonment followed by a term of five years' supervised release.  (Docket entry no. 587 ("Judgment").)  Mr. Anderson was resentenced by Judge Stein on July 12, 2018, and the supervised release portion of his sentence was decreased to two years.  (Docket entry no. 716.)  Mr. Anderson's conditions of supervised release included the mandatory condition that he must not commit another local, state, or federal crime.  (Judgment at 3.)

Mr. Anderson began the two-year supervised release portion of his sentence on November 8, 2021.  On July 5, 2023, during that two-year period, Mr. Anderson was arrested for possession of a firearm by New York Police Department ("NYPD") officers.  (Report at 3.)  That same day, Probation issued a violation report that charged Mr. Anderson with violating the conditions of his supervised release by possessing a firearm in violation of both state law and mandatory conditions of release (Specifications 1-6), and by testing positive for marijuana use (Specification 7).  (Id.)  Mr. Anderson appeared before Judge Stein and acknowledged Specifications 1 through 7 on July 24, 2023.  (Docket entry no. 869.)

On January 4, 2024, Mr. Anderson was indicted in connection with the same incident on one criminal charge of violating 18 U.S.C. Section 922(g)(1), which prohibits individuals previously convicted of a felony from possessing firearms.  (Docket entry no. 922 ("Gov. Mem.") at 2.)  That new case, No. 24-CR-009, was assigned randomly to the undersigned.  On January 18, 2024, Probation issued an amended violation report in the above-captioned case that added a corresponding Specification 8 charging Mr. Anderson with violating his conditions of supervised release by committing a federal crime.  (Report at 3.)  Subsequently, Probation added Specification 9 after Mr. Anderson failed to abide by the location monitoring condition of supervised release on multiple days.  (Report at 6.)

The above-captioned case, No. 13-CR-414, was consensually reassigned to the undersigned on March 26, 2024.  On January 23, 2025, Mr. Anderson pled guilty to the one-count indictment in Case No. 24-CR-009 and admitted the corresponding specification, Specification 8, in satisfaction of all then-pending specifications—Specifications 1 through 9— in the above-captioned case.  (Gov. Mem. at 2.)

While out on bail and awaiting sentencing, Mr. Anderson was arrested on the morning of February 14, 2025 by NYPD officers responding to a report of domestic violence.  (Report at 7.)  On February 19, 2025, Probation issued a third amended violation report charging Mr. Anderson with violating the conditions of his supervised release by committing two domestic violence-related state crimes (Specifications 10 and 11) and by failing to report to Probation as directed (Specification 12).  (Gov. Mem. at 2.)

On March 12, 2025, Mr. Anderson acknowledged and denied Specifications 10, 11, and 12.  (Gov. Mem. at 2; see also docket entry no. 904.)  On September 11, 2025, the Government moved to schedule a supervised release revocation hearing at which the parties would present evidence on the pending specifications.  (Docket entry no. 919.)  The Court then received and reviewed written submissions from both parties and ruled on their pre-hearing motions to admit hearsay evidence.  (Docket entry no. 924.)

At the hearing on November 4, 2025, Probation and the parties informed the Court that they intended to move forward only with Specifications 10 and 11.  (Nov. 4, 2025 Hr'g Tr. ("Tr.") 3:20-5:4.)  The Government presented the testimony of NYPD Officer Guadalupe Ayala, as well as bodycam footage and documentary evidence.  (Tr. 8:8-29:2.)  Counsel for the Defendant cross-examined Officer Ayala and presented documentary evidence.  (Tr. 29:6-37:11.)  The parties then offered oral argument and, at the Court's direction, later filed

letters listing cases relevant to the "substantial pain" element of the charge in Specification 11 under New York law.  (Tr. 38:23-60:18; docket entries no. 928, 929.)

## II.   DISCUSSION

### A.   Legal Standard

The Government bears the burden of proving, by a preponderance of the evidence, that Mr. Anderson violated the conditions of his supervised release as charged.  18 U.S.C. § 3583(e)(3).  "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not."  United States v. Edwards, 834 F.3d 180, 199 (2d Cir. 2016) (internal quotation marks omitted).  Because a supervised release revocation hearing is not part of a criminal prosecution, defendants "are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy."  United States v. Carthen, 681 F.3d 94, 99 (2d Cir. 2012) (quoting Morrissey v. Brewer, 408 U.S. 471, 480 (1972)).  For example, the "Confrontation Clause prohibitions against hearsay evidence do not strictly apply."  United States v. Aspinall, 389 F.3d 332, 342-43 (2d Cir. 2004).

### B.   Factual Findings

Upon careful review of Officer Ayala's in-court testimony and the video and documentary evidence that was admitted at the November 4, 2025 revocation hearing, the Court makes the following factual findings.

On the morning of February 14, 2025, the mother of Mr. Anderson's child (the "Victim") was at their home when Mr. Anderson came into the apartment.  (See Tr. 18:13-18; see also GX 301 at 3; GX 201-T at 19 (Victim stating that Mr. Anderson lived with her in the apartment).)  Some time before 6:17 a.m., Mr. Anderson and the Victim engaged in a verbal argument; Mr. Anderson, who had apparently been drinking, told the Victim to "[g]et out the bed

with [her] street clothes on" and began to "argue" with her.  (GX 201-T at 3; see also DIR at 3 ("He came in drunk mad.").)  Mr. Anderson yelled expletives at the Victim because she had the resume of one of her coworkers, whom Mr. Anderson believed had an inappropriate sexual interest in the Victim.  (GX 201-T at 3-4 ("He just went crazy. . . and then start asking me about a [coworker's] resume."); id. at 17 ("[T]hen he just started hitting me because he was asking about the resume.").)  After the Victim told Mr. Anderson that she did not want to argue with him, he "just started hitting" her.  (Id.)  After hitting the Victim multiple times in the face and side, Mr. Anderson choked the victim with both hands.  (Tr. 15:6-14, 18:19-24, 19:3-9, 25:16-27:17; see also GX 301 ("Domestic Incident Report" or "DIR") at 3 ("He came in arguing and calling me names.  Then he punched me in the face and choked me."); GX 201-T at 18 (Victim affirming that Mr. Anderson "hit [her] first" and "then he chok[ed]" her); GX 201-T at 5 ("He punched me in my face.  Choking me.").)

Afraid to be seen using her telephone to call for police assistance, the Victim dialed her mother's number and secreted the telephone in a location that would permit her mother to hear what was going on.  (Tr. 19:12-19); see also GX 201-T at 6 (Victim called her mother and placed the phone underneath the blanket so that her mother could hear her altercation with Mr. Anderson).)  At 6:17 a.m. on February 14, 2025, the Victim's mother called the police.  (Tr. 11:14-15, 12:13, 14:21-23; see also GX 103 ("911 Call"); GX 201-T at 1 ("I had my mother on the phone so she could call [911] for me.").)  Officers were dispatched to the scene at 6:20 a.m. and arrived at 6:22 a.m.  (Tr. 13:8-11.)  Shortly after arriving at the scene, Officer Ayala encountered the Victim in the hallway.  (Tr. 14:14-15:14.)  The Victim was "very upset, crying." (Tr. 15:1; see also GX 201 ("Ayala Bodycam Footage") (victim is visibly crying and distressed); GX 202 ("Ortiz Bodycam Footage") (same).)

At the scene and over the next 30 minutes, the Victim described the assault to three different officers; all of her statements are depicted in audio/video footage that clearly captures her demeanor.  (See Ayala Bodycam Footage; Ortiz Bodycam Footage.)  First, the Victim told Officer Ayala that she "got into a verbal argument" with Mr. Anderson and that the argument then became "physical" when Mr. Anderson "punched her and choked her."  (Tr. 15:6-14.)  The Victim stated that the "choking" had "just happened."  (GX 201-T at 1.)  When later questioned by Officer Ayala's superior, Lieutenant Talleyrand, the Victim indicated that Mr. Anderson had punched her in multiple places; Mr. Anderson also placed two hands around her neck and squeezed; and she experienced pain and had "a little bit" of trouble breathing as a result.  (Tr. 18:19-24, 19:3-9; 26:13-20.)  Finally, shortly before she left the scene at 6:53 a.m. to drop off clothes for her son, and in response to questioning from a third officer, Officer Granda, the Victim repeated a substantially identical account of the assault.  (Tr. 25:16-27:17.)

Officer Ayala did not observe any visible injuries on the Victim's face, neck, or side.  (Tr. 22:20-23:2, 29:21-30:11; see also GX 502; 503.)  The Victim described her pain as ranging from "some" or "a little bit" to "no" pain.  (Compare GX201-T at 5 with id. at 17.)  Officer Ayala testified that the Victim "stated that she was in pain at the time of the incident, and while she was taking down the [DIR] she was no longer in pain."  (Tr. 26:18-20.)

Based on its observations of her demeanor, the Court finds Officer Ayala's testimony to be credible.  Based on its observations of the Victim's demeanor from video footage and Officer Ayala's testimony as to the Victim's demeanor that day, the Court also finds the Victim's statements, made to police shortly after the assault on February 14, 2025, to be credible.

The Victim's July 2, 2025 statements characterizing the incident as a "disagreement" for which "the cops should've never been called" were made five months later in

a five-minute-long phone interview and do not undermine the credibility of her earlier statements to police.  (See DX 102.)  The July phone interview was brief and, based on the information provided at the hearing, contained very few details or specific factual proffers as to what happened on February 14, 2025.  (Id.)  The Victim, who at the time of the phone interview was still in a relationship with Mr. Anderson, stated that she "ha[d] nothing to say about the incident;" she did not explicitly recant her earlier statements that the "disagreement" was physical in nature, nor did she deny that Mr. Anderson punched and choked her on February 14, 2025.  (Id.)  By contrast, on the morning of the assault, the Victim repeatedly reported specific facts—that Mr. Anderson punched her multiple times and choked her with both hands—to multiple officers, and her description of the assault was consistent across these statements and the signed DIR.  Based upon its evaluation of the entire record, the Court credits the Victim's statements on the date of the incident and does not find the statements recorded in the later notes to be credible.

C.    Conclusions of Law Regarding Sufficiency of Proof

    1.    Specification 10 – Criminal Obstruction of Breathing

Specification 10 charges Mr. Anderson with violating the conditions of his supervised release by committing a state crime, criminal obstruction of breathing, in violation of New York Penal Law section 121.11, on February 14, 2025, when he choked the Victim with his hands around her throat.  (Report at 7.)

New York Penal Law section 121.11 provides that "[a] person is guilty of criminal obstruction of breathing or blood circulation when, with intent to impede the normal breathing or circulation of the blood of another person, he or she: a. applies pressure on the throat or neck of such person; or b. blocks the nose or mouth of such person."  N.Y. Penal Law

§ 121.11 (McKinney) (emphasis added).  For the reasons set forth below, the Court finds that the Government has proven Specification 10 by a preponderance of the evidence.

After considering the video and documentary evidence together with Officer Ayala's testimony, the Court concludes that the record establishes by a preponderance of the evidence that Mr. Anderson applied pressure on the Victim's throat or neck.  The Victim stated credibly that Mr. Anderson put "two hands" around her neck, that he squeezed, that it hurt, and that he obstructed her breathing "a little bit."  (GX 201-T at 6; see also Tr. 15:4-6, 18:19-24, 19:3-9.)  This credible account, the key elements of which were repeated by the Victim to police officers in the immediate aftermath of what had clearly been a traumatic incident, are sufficient to establish the legal elements of a violation of Section 121.11(a), as charged in Specification 10.

Mr. Anderson's intent is self-evident from his demeanor—enraged and volatile— and his method—applying pressure to the neck with both hands during a physical altercation. After striking the Victim repeatedly on her face and side, and during a confrontation in which he hurled expletives at her, Mr. Anderson placed two hands around the Victim's neck and applied pressure.  The inference that he intended to obstruct the Victim's breathing is sufficiently supported by both Mr. Anderson's specific actions, and the context in which he acted.  See United States v. Bradley, No. 13-CR-295-RJS, 2024 WL 1075411, at *2 (S.D.N.Y. Mar. 12, 2024) (holding that intent to impede normal breathing was "clear" from victim's testimony that the defendant placed his arm across her throat during a "physical altercation that began after he struck her across the face").  The defense's arguments focused on the absence of evidence of physical injury are not dispositive as to Specification 10:  while evidence of physical injury may have some limited relevance as to intent, it is not needed to prove criminal obstruction of

breathing under Section 121.11.[2]  See People v. Peterson, 988 N.Y.S.2d 271, 276 (App. Div., 3d

Dep't 2014) ("To commit strangulation [in violation of Section 121.11 or Section 121.12], . . .

there need not be an intent to cause physical injury, nor any physical injury caused.").

For the foregoing reasons, the Court finds by a preponderance of the evidence that

Mr. Anderson committed criminal obstruction of breathing in violation of Section 121.11, and

thus that he committed the violation described in Specification 10.

2.    Specification 11 – Assault in the Third Degree

Specification 11 charges Mr. Anderson with violating the conditions of his

supervised release by committing the state crime of assault in the third degree, in violation of

New York Penal Law section 120.00, on February 14, 2025, when he punched the Victim in the

face and ribs with a closed fist.  (Report at 7.)  For the reasons set forth below, the Court finds

that the Government has failed to prove the charge in Specification 11 by a preponderance of the

evidence.

New York Penal Law section 120.00 provides that "[a] person is guilty of assault

in the third degree when . . . [, w]ith intent to cause physical injury to another person, he causes

such injury to such person."  N.Y. Penal Law § 120.00 (McKinney) (emphasis added).  In

making the required intent and injury determinations, courts consider "the injury viewed

objectively, the victim's subjective description of the injury and her pain, and whether the victim

sought medical treatment."  People v. Rivera, 42 A.D.3d 587, 588 (App. Div., 3d Dep't 2007).

Here, the Government did not present evidence of discernable bruising, swelling, or other injury,

the Victim did not consistently describe her pain as substantial, and there is no evidence that she

---

[2]    While the Victim did not lose consciousness, that fact is also of little relevance here as
Specification 10 charges Mr. Anderson with violation of Section 121.11, not Section
121.12.  See N.Y. Penal Law §§ 121.11, 121.12 (strangulation in the second degree).

sought medical treatment.  In the absence of any such evidence, the Court cannot on this record make a proper inference that the Victim suffered the requisite physical injury as a result of Mr. Anderson's actions.

"Physical injury" is defined for purposes of Penal Law Section 120.00 as "impairment of physical condition or substantial pain."  N.Y. Penal Law § 10.00(9) (McKinney).[3]  Substantial pain "need not . . . be severe or intense"; "slight or trivial pain" is, however, insufficient to meet the "substantial pain" threshold.  People v. Chiddick, 8 N.Y.3d 445, 447 (2007).  While the Court finds the Victim's statements regarding her level of pain and the effect of Mr. Anderson's blows credible, they are insufficient, without additional evidence of pain or injury, to support a finding that it is more likely than not that she experienced "substantial pain"—and thus that Mr. Anderson committed assault in the third degree.  Cf. People v. Jiminez, 55 N.Y.2d 895, 896 (1982) ("Testimony that the victim suffered a one centimeter cut above her lip, without more, was not adequate to prove that the victim suffered . . . 'substantial pain.'").  "[A]lthough courts consider a victim's subjective experience in finding substantial pain under Section 10.00, that finding must still be supported by objective evidence."  United States v. Braun, 798 F. Supp. 3d 382, 391 (E.D.N.Y. 2025) (emphasis added).  The New York State Court of Appeals has held that "evidence that a victim cried, felt an unspecified degree of pain and suffered a 'red mark' after being hit twice by the defendant, without more, is insufficient" to prove substantial pain by a preponderance of the evidence.  Id. at 390 (citing Matter of Philip A., 49 N.Y.2d 198, 200 (1980)).  It follows that the evidence before this Court—that the Victim was

---

[3]     At the hearing, the Government stated that it was not arguing that there was any impairment of physical function and acknowledged that it is, therefore, "required to show substantial pain" to prove Specification 11.  (Tr. 59:20-60:3.)

distressed, felt some pain, and experienced no visible marks after being hit and choked by Mr. Anderson—is similarly insufficient.

None of the types of objective evidence of substantial pain on which courts typically rely are present here.  For example, photographs of visible marks or testimony from a person other than the victim as to the appearance or painfulness of an injury can serve as objective evidence that a victim of assault suffered substantial pain within the meaning of Section 10.00.  Compare People v. Rojas, 61 N.Y.2d 726, 727 (1984) (substantial pain proven where the injury was still visible at trial and the treating doctor testified that the bullet caused a laceration 1.5 inches in length that "could have caused pain") with People v. McDowell, 28 N.Y.2d 373, 321 (1971) ("[I]incidental reference to a blackened eye without any development of its appearance, seriousness, accompanying swelling, or suggestion of pain was insufficient.") and People v. Jiminez, 55 N.Y.2d 895, 896 (1982) ("Testimony that the victim suffered a one centimeter cut above her lip, without more, was not adequate to prove that the victim suffered . . . 'substantial pain.'").  A victim's effort to obtain medical treatment can similarly support a finding that the pain caused by an injury was not "slight or trivial."  People v. Chiddick, 8 N.Y.3d 445, 447 (2007) (that victim sought medical treatment for a broken, bleeding fingernail was evidence of how painful the injury was).

The objective evidence presented here is insufficient to support a finding of substantial pain, even by a preponderance of the evidence.  There are no medical records documenting the Victim's injury, nor do photographs taken at the scene indicate a clear or significant injury.  While "several repeated punches to the face . . . viewed objectively, would cause substantial pain," United States v. McCourty, 789 F. App'x 232, 235 (2d Cir. 2019), here there is no evidence—such as photographs or third-party observations—other than the Victim's

own unelaborated statements to support a finding that she experienced substantial pain. Cf. id. (where hospital records reflected facial contusions and swelling and the responding officer observed visible injury such as bruising). There is also no evidence that the Victim sought any medical treatment. See People v. Chandler, 502 N.Y.S.2d 46, 47 (App. Div, 2d Dep't 1986) (finding no "substantial pain" where victim was struck on the head with a gun but did not seek medical treatment or lose consciousness); People v. Briggs, 728 N.Y.S.2d 763, 765 (App. Div, 2d Dep't 2001) (where complaining witness did not seek medical assistance); People v. Boley, 963 N.Y.S.2d 726, 727 (App. Div, 2d Dep't 2013) (same). Indeed, the Victim's characterization of the pain as "substantial" came only in an affirmative response to a police officer's use of the term in questioning, and she declined the officers' offer to summon medical assistance.

Because the Government has failed to provide "something more" to show that the Victim sustained an injury within the meaning of Section 10.00, it has not met its burden of proof on an essential element of Specification 11. In light of the Government's failure to prove that Mr. Anderson caused the Victim to suffer physical injury, it is unnecessary for the Court to evaluate whether the evidence is sufficient to support a finding that he intended to cause such injury.

## III.    CONCLUSION

For the foregoing reasons, the Court finds that the Government has met its burden of proving that Mr. Anderson committed the state crime charged in Specification 10, criminal obstruction of breathing. The Government's evidence is, however, insufficient to sustain the charge in Specification 11, assault in the third degree. The latter Specification is hereby dismissed.

Because the Government and Probation are no longer pursuing Specifications 12 and 13, and because Mr. Anderson has admitted Specification 8 in satisfaction of all other specifications, the Court hereby directs the defense to file its sentencing submission by **January 21, 2026**, and the Government to file its submission by  **January 28, 2026**  By **January 30, 2026**, the parties must meet and confer and file a letter informing the Court of their availability for sentencing on or after **February 9, 2026** in this matter, Case No. 13-CR-414, and in the related criminal case, No. 24-CR-009.

SO ORDERED.

Dated: January 6, 2026
      New York, New York

    /s/ Laura Taylor Swain
    LAURA TAYLOR SWAIN
    Chief United States District Judge